[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE: DEFENDANT'S MOTIONS TO DISMISS AGGRAVATING FACTORS
Under Connecticut law, if a defendant is convicted of capital felony, a penalty proceeding is held during which the trier of fact must weigh aggravating factors against mitigating factors in deciding whether to impose the penalty of death. If no aggravating factors exist, the death penalty cannot be imposed. General Statutes § 53a-46a. Certain factors set out in § 53a-46a (h) act as statutory bars to the imposition of the death penalty.
The parties have by agreement submitted this case to the Court for a determination of whether either of the two claimed aggravants, and one statutory bar to the imposition of the death penalty, can as a matter of law be proven. Some of the important issues raised in the pending motions involve questions of first impression in Connecticut that will ultimately have to be resolved by our Supreme Court. For the reasons stated below, the defendant's motions are denied in part and granted in part. Before turning to analysis of the legal issues at hand, it is first necessary to discuss the factual background of this case as stipulated to by the parties; the Court's authority to decide the pending motions; and relevant rules of statutory construction.
 I FACTUAL BACKGROUND
In a March 5, 1999 Information, the State has charged the defendant in this case with numerous crimes, including capital felony (count one), murder (count two), larceny in the second degree (count nine) and larceny in the third degree (count ten), in connection with a January 23, 1999, incident culminating in the death of East Hartford Police Officer Brian Aselton.[1] The State, in seeking the death penalty, has indicated that in the event the defendant is convicted of capital felony, it will offer evidence of two alleged aggravants. (Notice of Aggravating Factors dated CT Page 17005 July 12, 2000.) The claimed aggravants are, first, that the defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission of or attempted commission of a felony and he had been previously convicted of the same felony (§ 53a-46a (i)(1)); and second, that the defendant committed the offense in the expectation of the receipt of an item or items of pecuniary value (§ 53a-46a (i)(6)).[2]
The defendant has moved to dismiss both of these aggravating factors pursuant to a February 16, 2001 motion.[3] It is the defendant's claim that, as a matter of law, these aggravants cannot be proven. The defendant's arguments are fully set out in his Revised Memorandum in Support of Defendant's Motion to Dismiss Aggravating Factors dated February 23, 2001 ("Defendant's Revised Memorandum") and Amended Response to Court Order dated July 24, 2001 ("Defendant's Amended Response"). The State has filed a Memorandum in Opposition to Defendant's Motion to Dismiss Aggravating Factors dated March 23, 2001 ("State's Memorandum in Opposition") and a Supplemental Memorandum in Opposition to Defendant's Motion to Dismiss Aggravating Factors dated August 10, 2001 ("State's Supplemental Memorandum"). The parties have filed a Joint Stipulation of Facts dated March 23, 2001.[4] It is understood that this stipulation is solely intended to supply a factual basis for decision on these motions and in no way limits the introduction of evidence at trial. Oral argument was initially held on April 20, 2001. In the course of analyzing the issues involved, for reasons of judicial economy, the undersigned judge asked the parties to address the following additional question: if the predicate "same felony" offense under § 53a-46a (i)(1) was committed by a defendant when he was under the age of eighteen years, is there a statutory bar under § 53a-46a (h)(1), or a constitutional bar or prohibition, to the use of that predicate felony as an aggravating factor? This issue was briefed and further oral argument was held on November 30, 2001.
Having fully considered the arguments set forth by the parties, the Court concludes that the defendant's motions to dismiss should be (1) denied as to the "same felony" aggravant; (2) granted as to the "pecuniary gain" aggravant; and (3) denied with respect to whether there is a statutory bar or prohibition on the availability of the death penalty when the State relies upon the existence of a predicate, previous felony conviction committed prior to a defendant's eighteenth birthday.
 II AUTHORITY OF THE COURT TO RULE ON THE PENDING MOTION; BURDEN OF PROOF; STANDARD OF PROOF CT Page 17006
The parties have decided to submit these matters to the Court for decision, and have agreed that the Court has the authority to rule upon them as submitted. The Court in this ruling has engaged in no fact-finding, limiting itself to the stipulation of the parties. The Court agrees that it has the authority to decide the issues presented, and that, under the circumstances presented here, is required to rule on this matter. Before turning to the substantive legal issues raised, a brief discussion of the procedure being used will be useful, given the likelihood that this procedure may be used in other cases in the future, and given our Supreme Court's ruling in State v. Solek, 242 Conn. 409,699 A.2d 931 (1997).
When parties, by agreement, submit a legal issue to a court of competent jurisdiction, there is generally no legal impediment to the Court ruling on the issue. General Statutes § 54-56, upon which the defendant relies in making his motion, provides as follows: "[a]ll courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."
Although there is no explicit provision of law authorizing the Court to decide issues such as the ones presented in the defense's motions to dismiss in their present procedural posture, there is no provision of law prohibiting it, and this procedure has been used before in Connecticut. See State v. Reynolds, Superior Court, judicial district of Waterbury, Docket No. 207279 (May 11, 1995, West and Fasano, Js.) (14 Conn.L.Rptr. 294). Moreover, § 53a-46a (b) provides that a hearing in which the death penalty is considered as punishment for a capital felony "shall not be held if the state stipulates that none of the aggravating factors set forth in subsection (i) of this section exists or that any factor set forth in subsection (h) exists." If the State can stipulate to the nonexistence of any aggravants, eliminating the possibility that a defendant will be eligible for the death penalty, there is no logical reason why the State cannot agree to submit contested legal matters to a judge for determination.
The only decided case arguably on point, State v. Solek, supra,242 Conn. 409, does not suggest otherwise. In that case, our Supreme Court stated that "[t]he defendant has not cited and we have found no authority . . . that entitles a defendant to a pretrial judicial determination of ineligibility for the death penalty." (Citation omitted; emphasis added.) Id., 431. However, in Solek, unlike in this CT Page 17007 case, there was neither an agreement by the parties to submit a legal issue to the court for determination, nor an agreed upon stipulation of facts. Cf. State v. Daniels, 207 Conn. 374, 396, 542 A.2d 374 (1988) (concomitant with the trial court's discretionary power to declare a mistrial is its authority to enter a judgment "acquitting" the defendant of the death penalty). Practice Book § 42-20 provides in part that "[t]he judicial authority shall decide all issues of law and all questions of law arising in the trial of criminal cases." Nothing in the Practice Book prohibits the Court from ruling on these matters.
Moreover, the procedure being utilized in this case, which permits an initial determination of potentially dispositive legal issues to be made before trial, is commonly followed in other jurisdictions and is supported by strong reasons of public policy. The highest courts of numerous states have placed their imprimatur on the advisability, in proper circumstances, of trial courts deciding motions to dismiss aggravating factors at the earliest possible point in the process rather than after years — perhaps decades — of litigation. See, e.g., State v. Watson, 310 N.C. 384, 312 S.E.2d 448 (1984); State v.McCrary, 97 N.J. 132, 478 A.2d 339 (1984); State v. Ogden, 118 N.M. 234,880 P.2d 845, 850, cert. denied, 513 U.S. 936, 115 S.Ct. 336,130 L.Ed.2d 294
(1994) ("Pursuant to our superintending authority, we authorize district courts to perform pretrial review of death penalty aggravating circumstances. . . . A motion to dismiss an aggravating circumstance that presents a purely legal question should be granted when the district court finds that the aggravating circumstance does not apply as a matter of law."); Commonwealth v. Buck, 551 Pa. 184, 709 A.2d 892 (1998). So have various lower courts. See, e.g., Ghent v. Superior Court of Santa ClaraCounty, 90 Cal.App.3d 944, 954-55, 153 Cal.Rptr. 720 (1979) ("We accordingly conclude, as a matter of legislative intent, that the sufficiency of the evidence underlying allegations of special circumstances may be challenged on a pretrial motion . . .
In approving of this practice, the courts have typically cited three reasons. First and foremost, they have pointed to the enormous expenditure of resources involved in a death penalty case, and the desirability, in appropriate cases, of separating out cases which, under no circumstance, could as a matter of law support a penalty of death. As the New Jersey Supreme Court stated in State v. McCrary, supra,478 A.2d 339, cases in which the death penalty is sought "exact enormous commitments of time and resources." Id., 344. The North Carolina Supreme Court stated that it commends "this procedure for its judicial economy and administrative efficiency." State v. Watson, supra, 312 S.E.2d 448. Reasons of judicial economy argue strongly in favor of permitting appropriate legal issues to be tested prior to trial where at all possible. CT Page 17008
Second, cases which are treated as death penalty cases are handled differently, in significant ways, from cases that are not. Death qualification of jurors and a separate penalty phase are two important distinctions. State v. McCrary, supra, 478 A.2d 339. The time invested in obtaining a "death qualified" jury, and the gathering of evidence for the penalty phase, are unique factors in capital trials. None of this is necessary if the case is identified early in the process as a case which for legal reasons cannot support the death penalty.
Finally, there are human factors. The emotional toll that years of litigation takes on the families of victims is substantial. There is no sound reason why a victim's family should have to endure the entire, excruciating death penalty process, only to learn, after trial and years of litigation, that the defendant does not qualify as a matter of law for execution. The earlier these issues are raised and decided, the better for the families of the victims.
The parties agree that § 41-9 of the Practice Book does not require a different conclusion. This section states that: "[n]o defendant who is charged with a crime punishable by death or life imprisonment for which probable cause has been found at a preliminary hearing pursuant to General Statutes § 54-46a or who has been arrested pursuant to a warrant may make a motion under subdivisions (5) or (9) of Section 41-8."
The defense believes that § 41-9 is not applicable because there has been no finding of probable cause as to the alleged aggravating factors. (Defendant's Amended Response, p. 1.) The State's view is that the instant motion "cannot be precisely fit within existing practice book sections and in view of State v. Solek, supra, these sections probably do not apply." (State's Supplemental Memorandum in Opposition, p. 2.) This Court agrees that § 41-9 does not prevent the pending motions from being addressed prior to trial.
In sum, our Supreme Court's decision in Solek does not prohibit the procedure being used in this case. The State in this case is commended for its willingness to submit these issues to the Court, in light of the above factors which make such a procedure advisable in the proper case.
 A Burden of Persuasion; Standard of Proof
In the absence of any Connecticut case law to provide guidance, other preliminary questions must be addressed. CT Page 17009
First is the issue of who bears the burden of persuasion on a motion to dismiss an aggravant. All of the above-cited cases, plus practicality, put the burden on the party claiming that the death penalty is not as a matter of law available. See State v. McCrary, supra, 478 A.2d 347 ("A defendant who challenges the sufficiency of the evidence to support an aggravating factor bears the burden of proving that contention."); see also Commonwealth v. Buck, 709 A.2d 892; In re Grand Jury Investigationby Curran, 19 Conn. App. 230, 233-34, 561 A.2d 974 (1989) (moving party generally has burden of persuasion). This Court concludes that in this case the defendant has the burden of persuasion to demonstrate that a particular aggravant, as a matter of law, is not available.
Second is the question of what standard of proof should be applied. Different courts have adopted different formulations. The Supreme Court of New Mexico has concluded that where a motion to dismiss an aggravant presents a question of law, it should be granted "when the district court finds that the aggravating circumstance does not apply as a matter of law." State v. Ogden, supra, 880 P.2d 850. When a mixed question of law and fact, or a question of fact, is involved, that same court concluded that the defendant's motion to dismiss should be granted only when the court finds that "there is not probable cause to support the aggravating circumstance." Id., 851. The Pennsylvania Supreme Court formulated the issue differently in Commonwealth v. Buck, supra, 709 A.2d 896-97, where it concluded that a motion to dismiss aggravants must be denied if there is any evidence supporting the existence of an aggravant. The New Jersey Supreme Court formulated it this way: "[d]efense motions to strike an aggravating factor should be brought only when the supporting evidence is so thin, so lacking, so weak as to leave no room in the minds of a reasonable fact-finder as to the existence of that aggravating factor."State v. McCrary, supra, 478 A.2d 347.
The State in this case argues that the standard of proof "can be roughly analogized to a Motion for Summary Judgment but is probably closer to a Motion to Strike, where the facts most favorable to the state are admitted as true." (State's Supplemental Memorandum, p. 2.) The defense also takes the view that the. claims raised should be roughly analogized to a motion for summary judgment, that the evidence must be viewed in the light most favorable to the nonmoving party, with the moving party bearing the burden of showing that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. (Defendant's Amended Response, pp. 1-2.); see also Practice Book § 17-49.
Ultimately, our Supreme Court will have to determine what the precise standard should be in Connecticut. While the Pennsylvania and New Jersey Supreme Courts have adopted different formulations, the thrust is the CT Page 17010 same: if there is any evidence from which a reasonable jury could conclude beyond a reasonable doubt that an aggravant has been proven, the issue must be reserved for the jury, not the court. Civil practice with respect to motions for summary judgment provide a useful guide. Under Practice Book § 17-49, motions for summary judgment should be granted only where "the pleadings, affidavits and any other proof submitted show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the court must draw all inferences in favor of the nonmoving party, since granting the motion deprives the nonmoving party of their constitutionally guaranteed right to trial.
This Court concludes that motions such as the motions to dismiss the aggravants in the instant case should be viewed as roughly analogous to a motion for summary judgment and that the rules that apply to such motions should apply here. That is, the evidence should be viewed in the light most favorable to the nonmoving party, and such motions should be granted only when there is no evidence supporting the State's claimed aggravant, such that no reasonable fact finder could find that the claimed aggravant exists as a matter of law. This standard will ensure that, in jury trials, the trial court will grant such motions only when as a matter of law they should be granted, and will reserve disputed issues of fact for the jury's determination.
 III GENERAL GUIDING LEGAL PRINCIPLES
Before turning to the specific issues raised by the defendant's motion, it is necessary to set out some of the general legal principles which form the backdrop for the Court's analysis. To provide context, it is instructive to review general rules of statutory construction and interpretation, including a discussion of how these rules apply to death penalty cases.
General Statutes § 1-1 states in relevant part that: "(a) [i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language; and technical words and phrases, and such as have acquired a peculiar and appropriate meaning in the law, shall be construed and understood accordingly."
It is fundamental that statutory construction requires the court "to ascertain the intent of the legislature and to construe the statute in a manner that effectuates that intent. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative CT Page 17011 policy it was designed to implement, and to its relationship to existing legislation." Petco Insulation Co. v. Crystal, 231 Conn. 315, 321,649 A.2d 790 (1994). "The process of statutory interpretation involves a reasoned search for the intention of the legislature." (Internal quotation marks omitted.) State v. Ehlers, 252 Conn. 579, 589,750 A.2d 1079 (2000).
Criminal statutes, it has long and repeatedly been held, "are not to be read more broadly than their language plainly requires." (Internal quotation marks omitted.) State v. Crowell, 228 Conn. 393, 400,636 A.2d 732 (1994). "[P]enal statutes are to be construed strictly and not extended by implication to create liability which no language of the act purports to create." (Internal quotation marks omitted.) State v.Woods, 234 Conn. 301, 308, 662 A.2d 732 (1995). "[A]mbiguities are ordinarily to be resolved in favor of the defendant." State v. McGann,199 Conn. 163, 177, 506 A.2d 109 (1986). "Courts must avoid imposing criminal liability where the legislature has not expressly so intended." (Emphasis added.) State v. Breton, 212 Conn. 258, 268-69, 562 A.2d 1060
(1989). "The rules of strict construction and lenity applicable to penal statutes generally are especially pertinent to a death penalty statute such as [General Statutes] § 53a-54b." (Internal quotation marks omitted.) State v. Harrell, 238 Conn. 828, 832, 681 A.2d 944 (1996);State v. McGann, supra, 199 Conn. 177. Strict construction is "all the more compelling where, as here, the defendant's life is at stake." Statev. Breton, supra, 212 Conn. 269. "It is axiomatic that any statutory construction implicating the death penalty must be based on a conclusion that the legislature has clearly and unambiguously made its intention known." State v. Harrell, supra, 238 Conn. 833; see also State v. Jones,234 Conn. 324, 340, 662 A.2d 1199 (1995); State v. Ross, 230 Conn. 183,200, 646 A.2d 1318, cert. denied, 513 U.S. 1165, 115 S.Ct. 1133,130 L.Ed.2d 1095
(1995). Moreover, "[i]t is a fundamental tenet of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment." (Internal quotation marks omitted.) State v.Hinton, 227 Conn. 301, 317, 630 A.2d 593 (1993).
These rules of construction embody a deeply rooted principle in our law carrying constitutional implications: the right of a defendant to be clearly informed of the consequences of his acts in advance of committing them. In the context of analyzing whether a statute should be declared unconstitutional as "void for vagueness, our Supreme Court has noted that defendants have "the right to fair warning of the effect of a governing statute or regulation and the guarantee against standardless law enforcement." State v. Schriver, 207 Conn. 456, 460, 542 A.2d 686
(1988).
At the same time, these principles do not mean "that every criminal CT Page 17012 statute must be given the narrowest possible meaning in complete disregard of the purpose of the legislature. . . . [n]o rule of construction . . . requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope — nor does any rule require that the act be given the `narrowest meaning.' It is sufficient if the words are given their fair meaning in accord with the evident intent of [the legislature]. . . . [s]trict construction does not mean that a statute must be read in isolation. In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Citations omitted; internal quotation marks omitted.)State v. Singh, 213 Conn. 637, 646-47, 569 A.2d 1112 (1990). A statute must not be read so as to frustrate the legislature's intention and render it "unworkable." State v. Daniels, supra, 207 Conn. 390. A court "cannot read into the terms of a statute something which manifestly is not there in order to reach what the court thinks would be a just result." (Internal quotation marks omitted.) Johnson v. Manson,196 Conn. 309, 315, 493 A.2d 846 (1985), cert. denied, 474 U.S. 1063,106 S.Ct. 813, 88 L.Ed.2d 787 (1986). Neither should courts "rewrite a statute to accomplish a particular result. That is the function of the legislature." (Internal quotation marks omitted.) State v. Perruccio,192 Conn. 154, 163 n. 4, 474 A.2d 632 (1984), appeal dismissed,469 U.S. 801, 105 S.Ct. 55, 83 L.Ed.2d 6 (1986).[5]
 IV THE FIRST ALLEGED AGGRAVANT: "SAME FELONY" AGGRAVATING FACTOR
The State first alleges as an aggravant that the defendant committed the instant offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and that the defendant had previously been convicted of the same felony. General Statutes § 53a-46a (i)(1).
It is agreed that among the felonies with which defendant is charged in the March 5, 1999 Information is attempted larceny in the third degree, in violation of General Statutes §§ 53a-49 (a)(2) and 53a-124 (a)(2) (count ten), as well as larceny in the second degree, in violation of §§ 53a-123 (a)(3) and 53a-8 (count nine). The defense essentially makes two arguments, which will now be considered.
 A Defendant's Argument that the Murder was not Committed During the "Flight Therefrom" the Attempted Larceny in the Third Degree CT Page 17013
The defendant argues that, in light of the stipulated facts, the murder was not committed during the "flight therefrom" the attempted larceny in the third degree. (Defendant's Revised Memorandum, pp. 16-17.) This argument raises an issue of fact that is properly considered by the trier of fact during trial, not by the Court in ruling on a pretrial motion. It is therefore rejected.
 B
Defendant's Argument that the Present Charge of Attempted Larceny in the Third Degree is not the "Same Felony" as the Defendant's Conviction in May, 1993
Section 53a-46a (i)(1) provides that it shall be an aggravating factor if the State proves that "[t]he defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attempted commission of, a felony and he had previously been convicted of the same felony." (Emphasis added.)
The defendant argues that the present charge of attempted larceny in the third degree in violation of §§ 53a-49 (a)(2) and 53a-124 (a) (2), found in count ten of the information, (the "present felony") is not the "same felony" as the defendant's 1993 conviction for larceny in the third degree ("the predicate felony") which involved the theft of a motor vehicle, because the elements of these two offenses are not identical. Employing the approach to elements analysis utilized in double jeopardy cases established in Blockburger v. United States, 284 U.S. 299,52 S.Ct. 180, 76 L.Ed.2d 306 (1932) and followed in Connecticut in State v.Alvarez, 257 Conn. 782, 778 A.2d 938 (2001), the defense contends that one element of the predicate felony is different from an element of the present felony. One commits the predicate felony under § 53a-124 (a) (1) when committing a larceny relating to property consisting of a motor vehicle "the value of which is five thousand dollars or less," the defense argues, while one commits the present felony under § 53a-124
(a)(2) when the value of the property or service "exceeds one thousand dollars." The amount of the offense is an essential element which must be proven, the defense notes. See State v. Cochran, 191 Conn. 180, 190,463 A.2d 618 (1983). If the elements are not identical, the argument goes, then the offenses cannot be said to be the "same offense" for purposes of § 53a-46a (i)(1).
The State disputes this argument, asserting that the two felonies are the "same felony" because they are classified as the same offense, e.g., they are both felony larcenies — and the same degree. The term "same felony" is essentially unambiguous, in the State's view, and if CT Page 17014 read as the defendant contends, would lead to absurd and unintended results. Moreover, the State argues, a Blockburger-type elements analysis, while required in the double jeopardy framework, is not an appropriate analytical tool with which to analyze the issue in the context of determining the meaning of § 53a-46a (i)(1).
This Court agrees with the State and concludes that the term "same felony" applies to felony offenses bearing the same classification, e.g., which are both denominated larcenies, robberies, burglaries, and the like. The defendant's motion to dismiss this claimed aggravant is therefore denied for the following reasons.
 1 The Plain Language of the Statute
Both sides argue that the words "same felony" are unambiguously clear. The defense claims that the term "same felony" must be read to mean a "felony having identical elements." The State argues that, given its ordinary meaning, in the context of the statute, "same felony" means "same felony offense." Analysis of this issue leads the Court to conclude that the defendant's argument cannot withstand scrutiny.
A good starting point for analysis is a discussion of the plain meaning of the words "same" and "felony." Like most words, the word "same" has different meanings or shades of meaning, depending on the context in which it is used. The issue which must be determined is what the legislature had in mind when it used the term "same felony." Reference to various dictionary definitions is a helpful way to discern the different meanings and shades of meaning given to the word "same."
"Same" can mean selfsame or one and the same, e.g., "[t]hat is the same man I saw at the Lincoln Memorial last Thursday." Clearly, that is not the sense in which "same" is being used in § 53a-46a (i)(1) because two different events are being compared. "Same" can also mean "of the same kind or species, not the specific thing." Black's Law Dictionary (5th Ed. 1979).
Webster's Third New International Dictionary defines same as "resembling in every way: not different in relevant essentials . . . having one nature or individuality: of like nature or identity: identical . . . corresponding so closely as to be indistinguishable: closely similar: comparable." "Same" is also defined as "similar in kind" in the American Heritage Dictionary, Second College Edition; "alike in kind" in Webster's New Riverside University Dictionary; "of like kind, species, sort, dimensions, or the like; not differing in character or in the CT Page 17015 quality or qualities compared; corresponding; not discordant; similar; like" in Webster's Revised Unabridged Dictionary, 1913 Edition.
But "same" — even when not used to mean "one and the same" — can be used to mean "identical," the defense points out. "The ordinary meaning of the word `same' is `resembling in every respect; identical; corresponding so closely as to be indistinguishable.' Webster, Ninth New Collegiate Dictionary (1983)." Lundgren v. Stratford,12 Conn. App. 138, 145, 530 A.2d 183, cert. denied, 205 Conn. 808,531 A.2d 939 (1987); see also Hawley v. Snider, 77 N.W.2d 754 (Mich. 1956).
The word "felony" is generally understood to mean any crime punishable by more than a year in jail. In Connecticut, General Statutes § 53a-25
states that "[a]n offense for which a person may be sentenced to a term of imprisonment in excess of one year is a felony." Prior to 1975, the term "offense" was defined in General Statutes § 53a-24 to mean "any crime or violation which constitutes a breach of law of this state or local law or ordinance of a political subdivision of this state, for which a sentence to a term of imprisonment or to a fine, or both, may be imposed, except one that defines a motor vehicle violation." (Emphasis added.) Public Acts 1975, No. 75-380 amended § 53a-24 to add the phrase "federal law, the law of any other state." After 1975, consequently, the term "offense" was defined to mean "any crime the violation of which constitutes a breach of any law of this state or ofany other state or federal law or local law or ordinance of a political subdivision of this state . . . (Emphasis added.)
There is only one reported decision concerning this issue in the context of the death penalty. See State v. Reynolds, supra,14 Conn.L.Rptr. 294. In that case, now on appeal, the State argued that the defendant's previous New York felony conviction — sale of a controlled substance in the fourth degree — was the "same felony" as the Connecticut drug felony which the defendant was engaged in at the time he committed a murder. Judges West and Fasano came to the conclusion that "defining the `same offense' . . . as an offense having substantially the same essential elements, is reasonable, consistent with Connecticut authorities, and more importantly, consistent with the legislative policy behind the first aggravating factor." Id., 297.
The Reynolds case posed a different issue than the instant one and called for a different analytical approach. Faced with the comparison of a New York conviction involving a different classification scheme and different nomenclature, Judges West and Fasano prudently settled upon aBlockburger-type of elements analysis used in the double jeopardy context in determining whether an out-of-state offense was essentially the "same CT Page 17016 offense" as the Connecticut offense charged. This Court agrees that this was the correct approach given the facts in Reynolds. Elements analysis is a logical and helpful approach to determining legal "sameness" when comparing statutes from different jurisdictions when the classification systems involved, and the nomenclature involved, may differ. To transport that analytical approach into this case, however, would not be appropriate. In this case, two Connecticut offenses — both felony larcenies — are being compared. The legislature has already determined that these crimes are both felony offenses, e.g., the "same felony," by placing them into the same statutory framework. "The process of statutory interpretation involves a reasoned search for the intention of the legislature." (Internal quotation marks omitted.) State v.Ehlers, supra, 252 Conn. 589; see also State v. Gurreh, 60 Conn. App. 166,171, 758 A.2d 877, cert. denied, 255 Conn. 916, 763 A.2d 1039 (2000). Giving the term "same felony" a commonsense reading, this Court concludes that the most logical and practical meaning which can be given to the term "same felony" is a reference to a felony for the same offense.
This conclusion is buttressed by the fact that the legislature used the precise term "same felony," not a variety of alternative formulations available to it. It could have chosen to use the language "felonies with identical elements," or "felonies with substantially the same elements," or "felonies with similar elements," but it did not. Its focus, in other words, was not on the elements making up the crime, but the manner in which the felony was classified.
The term "same felony" is found only once in our penal code — in § 53a-46a (i)(1). Other Connecticut statutes, and case law, provide strong circumstantial. evidence that if the legislature had intended the term "same felony" to mean "felony having identical elements" as the defendant contends, that it knew how to do so. Three Connecticut statutes are particularly on point.
General Statutes § 53a-40, defining different varieties of persistent offenders, in defining "persistent dangerous felony offender" and "persistent dangerous sexual offender" refers to prior convictions in other states for crimes "the essential elements of which are substantially the same" as certain enumerated crimes. See General Statutes §§ 53a-40 (a)(1)(A) and (a)(2)(A) and 53a-40 (b).
General Statutes § 54-56g (a), relating to the pretrial alcohol education system also refers to convictions in other states for offenses "the essential elements of which are substantially the same" as certain enumerated offenses.
General Statutes § 45a-447, relating to when a person is guilty of CT Page 17017 killing another to inherit from or receive property or insurance proceeds as a beneficiary of the victim, also uses language absent from §53a-46a. Section 45a-447 refers to persons finally adjudged guilty of certain enumerated crimes "or in any other jurisdiction of any crime, the essential elements of which are substantially similar to such crimes. . . ."
Moreover, numerous statutes illustrate the legislature's facility in the use of different and precise formulations when referring to prior instances of misconduct. For instance, General Statutes § 53a-38, "Calculation of terms of imprisonment," refers to "the same offense or for an offense based on the same act." General Statutes § 54-57, relating to joinder of offenses, references "offenses of the same character," while General Statutes § 54-62, "Allegation of previous conviction," refers to "a similar offense." Further, General Statutes § 54-64a, "Release by judicial authority," in subsection (b)(2)(K) refers to persons who have "previously been convicted of similar offenses while released on bond."
The defense's argument that a Blockburger based double jeopardy analysis must be used is not persuasive. The State correctly notes that double jeopardy elements analysis was not designed to compare a previous crime, like the ones postulated in the aggravant statute, with the present crime, resulting in death. Cf. State v. Ellis, 197 Conn. 436,471-72, 497 A.2d 974 (1985) ("That two offenses may be the `same' for purposes of double jeopardy does not mean that they are the same for purposes of the statute of limitations, or res judicata, or for any other purpose.") Double jeopardy elements analysis, while perhaps a helpful analytical tool in comparing different felonies to discern if they are the "same" when comparing felonies from different jurisdictions, is not useful when evaluating whether two similarly classified Connecticut felonies are the "same felony" for purposes of § 53a-46a.
The State also argues that the defendant's interpretation of the statute relating to the "same felony" issue, if accepted, would lead to "absurd" results. (State's Memorandum in Opposition, p. 11.) This Court agrees. For example, the State notes, if the defense interpretation was accepted, someone convicted of larceny in the second degree in violation of § 53a-123 (a)(1) for theft of a vehicle valued in excess of $5,000 who later steals the same vehicle, now valued at $4,000, and murders two people, would fall outside the ambit of the statute because the second conviction was for larceny in the third degree under §53a-124 (a)(1).
It is of course possible to construct hypothetical scenarios that would render any statute unworkable. But the defense view, if adopted, would CT Page 17018 lead to the conclusion that the prior larceny in the third degree conviction and the present offense were not the "same offense" because of the difference in the elemental amounts at issue. While such distinctions are legally significant for purposes of double jeopardy analysis, it is simply not reasonable to assume that the legislature would have wanted to apply this approach to the issue at hand given the overall thrust of the statute.
 2 Legislative History and Circumstances Surrounding Statute's Enactment
A review of all available legislative history does not affect this Court's analysis on this point. Unfortunately, there is virtually nothing in the legislative history which provides any direct insight into what the legislature's purpose was when it used the words "same felony" in § 53a-46a (i)(1). The issue was never discussed, debated, or even referred to. The parties have been unable to come up with any sources that could shed light on this issue.
Connecticut appears to be the only state in the nation with this aggravant. The statutes of other states refer to prior violent or assaultive felonies, not simply prior felonies that are merely "the same," irrespective of whether they involved crimes against property, not people. Notwithstanding that, the State's argument is persuasive.[6]
 3 Attempt Issue
The fact that a prior, predicate "same felony" was a completed crime, while the presently charged "same felony" was only an attempt, is not legally significant. Section 53a-46a (i)(1) by its very terms provides that aggravating factors include circumstances in which "[t]he defendant committed the offense during the commission or attempted commission of, or during the immediate flight from the commission or attemptedcommission of a felony and he had previously been convicted of the same felony." (Emphasis added.)
 C Summary and Conclusion — Same Felony Issue
In conclusion, in light of the plain language of the statute, reference to the language of other Connecticut statutes, the legislature's apparent purpose, and the illogical results that would result from acceptance of CT Page 17019 the defendant's view that "same felony" should be read to mean "felony having identical elements," the defendant's argument must be rejected. The most logical and commonsense reading of the term "same felony" leads to the conclusion that this term should apply to felony offenses having the same classification in our statutes. This Court concludes that the defendant's prior conviction for larceny in the third degree and the present charge of attempted larceny in the third degree — as well as the present charge of larceny in the second degree — refer to the "same felony" as a matter of law. Accordingly, the defendant's motion to dismiss the first claimed aggravant is denied.[7]
 V THE SECOND ALLEGED AGGRAVANT: "PECUNIARY GAIN" AGGRAVATING FACTOR
The parties take different views of § 53a-46a (i)(6). The State argues that it applies to the facts of this case; the defendant says it does not as a matter of law. Consideration of the parties' arguments and evaluation of the statutory language at issue persuades this Court that the defendant's argument is the more persuasive. For the following reasons, the defendant's motion to dismiss the second claimed aggravant is granted.
 A Statutory Language
Section 53a-46a (i) provides in relevant part that: "[t]he aggravating factors to be considered shall be limited to the following . . . (5) the defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value; or (6) the defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."
It is noteworthy that the subsection pursuant to which the defendant is charged, subsection (6), uses the term "pecuniary value," while the capital felony statute, in § 53a-54b (2), refers to "pecuniary gain.".[8] Courts analyzing these terms have tended to view them as roughly synonymous.
 1 Structure of the Statute
A number of things become apparent when examining the relevant CT Page 17020 statutory language and giving it a reading employing the words in their usual sense. First of all, there is a parallelism between §§ 53a-46a
(i)(5) and (i)(6). Subsection (i)(5) applies to the person doing theprocuring through the payment or promise of payment of anything of pecuniary value; subsection (i)(6) applies to the person who is procured. Subsection (i)(5) makes reference to the procurer procuring the commission of the offense by payment or promise of payment of anything of pecuniary value. Subsection (i)(6) refers to the defendant committing the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value. It is logical to read these two subsections together in attempting to determine the meaning of §53a-46a (i)(6). A commonsense reading of these two subsections suggests a relationship between two persons — the person setting the offense in motion (the procurer under § 53a-46a (i)(5)) and the person actually accomplishing the offense (the person procured under § 53a-46a
(i)(6)), although § 53a-46a (i)(6) may also be read to reach additional situations outside the bounds of a two-party interaction.
Likewise, the language of § 53a-46a (i)(6) itself is suggestive of a relationship between the person procured and some other person who has agreed to make a payment, either in the present, or the future, to the person procured to commit the offense. Moreover, the language of the statute is couched in terms familiar to contract law: the word "consideration," and to a lesser extent, "receipt" and "pecuniary value" all conjure up transactions between two persons engaged in a mutual exchange of things of value. Black's Law Dictionary defines the term pecuniary benefit as "`[b]enefits that can be valued in money.'" Leclairev. Vernon, Superior Court, judicial district of Tolland at Rockville, Docket No. 44254 (Aug. 4, 1992, McWeeney, J.). if the statute was intended to apply to someone who commits a robbery to obtain property, the legislature would in all probability have used the word "obtain," not the word "receive." The plain language of the statute, in this Court's view, suggests that it was meant to be applied to a murder-for-hire situation and other narrowly circumscribed situations, discussed below, where something is received by the operation of law.
What these other narrowly circumscribed circumstances are is at the heart of the disagreement between the parties. The State argues that the statute covers the conduct stipulated to in this case; the defense argues that it does not.
 2 Relevant Case Law
The reasoning employed in a number of cases assists in analyzing what CT Page 17021 this statute means. Chief among them are State v. Rust, 197 Neb. 528,250 N.W.2d 867, cert. denied, 434 U.S. 912, 98 S.Ct. 313, 54 L.Ed.2d 198
(1977); State v. McDonald, 661 S.W.2d 497 (Mo. 1983); United States v.Walker, 910 F. Sup. 837 (N.D.N.Y. 1995); United States v. Nguyen,928 F. Sup. 1525 (1996); and State v. Chew, 150 N.J. 30, 695 A.2d 1301
(1997). It appears that the majority of reported decisions support the arguments made by the State. See, e.g., State v. McDonald, supra,661 S.W.2d 497 (containing a detailed analysis of issues relating to a monetary value" analysis, and citations to other cases). Another view is reflected in State v. Chew, supra, 695 A.2d 1301, in which the New Jersey Supreme Court ruled that the "pecuniary value" aggravant was not limited to "murder-for-hire" situations and extended to killings to obtain insurance proceeds, but that the statute did not extend to killings in the course of a robbery. It must be stressed that numerous factors influence the decisions of the courts in each state, including the precise statutory language of that state's aggravant statute; the overall scheme of the death penalty statutes in the state; and precedent. It is also important to note that in both Rust and Chew, the statutes provided separate and distinct aggravants applicable to killings in the course of robberies. The Nebraska and New Jersey Supreme Courts relied on that fact in reaching their decisions, reasoning that it would be "double-counting" to apply the "pecuniary gain" factor to a killing in the course of a robbery when a separate aggravant already related to such crime. Notwithstanding the analysis provided by other courts relating to other statutes, the question still remains to be answered in Connecticut: was it the legislature's intention that § 53a-46a (i)(6) extend to killings which facilitated robberies, burglaries or larcenies?
The State's arguments are set forth in the decisions of cases such asMcDonald and Walker, in which a federal district court analyzed "pecuniary value" language under 21 U.S.C. § 848. That section provides that it shall be an aggravating factor if the defendant "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value" — language identical to § 53a-46a (i)(6). In Walker, the defendants made arguments similar to those being put forth by the defendant in this case. The court rejected them and stated that:
 Defendants argue that § 848(n)(7) is intended to apply only to either "murder for hire . . . or, for example, to gain an inheritance or life insurance proceeds". . . . They argue that the government's evidence will at best show that the . . . homicide was committed in the course of a robbery, and that the intent with which the murder is carried out has to be pecuniary gain over and above robbery. The court finds CT Page 17022 that defendants' interpretation is an unreasonably restrictive reading which does not comport with the structure and plain language of the statute.
 The Court first notes that § 848(n)(7) has two prongs: that the offense was committed "as consideration for the receipt," or "in expectation of the receipt" of something of pecuniary value. Defendants' view seems correct that the first prong's use of the "as consideration for" language of contract contemplates murder-for-hire. For this Court to transport that restriction to the second, "in expectation of the receipt" prong, however, would render the clause mere surplusage. Defendants also point to the statutory structure and argue that since this factor follows § 848(n)(6) ("The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value") . . . Congress intended § 848(n)(7) to identify the flip-side of procuring a murder-for-hire. It is enough to say that a finding that the first clause does indeed comprehend the other half of murder through solicitation does not preclude Congressional use of the second clause as a means of narrowing application of the death penalty by establishing as an aggravating factor all intentional murders committed with the expectation of any pecuniary benefit.
 Nor can the Court reasonably restrict the term "expectation" to its Dickensian aspect of inheritance. Webster's defines "expectation" as "1. The act of expecting or state of being expected. 2. Eager anticipation." WEBSTER'S II NEW RIVERSIDE DICTIONARY 455 (1994). "Expect" is defined therein as "1. to look forward to the probable occurrence or appearance of; 2. To consider likely or certain." Id. In short, nothing in the plain and ordinary meaning of "expectation" serves to limit an understanding of Congress' use of the term to murders in expectation of the receipt of an inheritance. Defendants themselves recognize this by admitting to the language's sweep, murder in expectation of insurance proceeds. They offer no principled reason why the second prong stops there and reaches no further, however, and the Court sees no textual basis upon which to conclude that the second clause admits these fact patterns but excludes CT Page 17023 all others.
 In short, nothing in the plain language or the structure of the statute militates for defendants' restriction of "in expectation of the receipt, of anything of pecuniary value." Indeed use of the phrase "anything of pecuniary value" further contravenes such a narrowing construction. See Smith . . . 113 S.Ct. at 2054. ("The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it.") The Court will not, then, find that § 848(n)(7) can only apply to murder-for-hire or murder in anticipation of an inheritance or insurance proceeds. Defendants' motion to dismiss this factor on that basis is DENIED.
United States v. Walker, supra, 910 F. Sup. 848-49.
Having considered the arguments of the parties, this Court concludes that the majority view, expressed in McDonald, Walker and like cases, while plausible, represents an overly-broad reading of "pecuniary gain" or "pecuniary value" statutes. The question is not whether the language of the "pecuniary value" aggravant can support the broad reading urged by the State, but whether the legislature intended that it should be so applied. This represents a close issue, but it is my view that the defendant's argument is more persuasive for the following reasons.
 B Discussion/Analysis of General Statutes § 53a-46a (i)(6) 1 Plain Language of the Statute
This Court concludes that the plain language of the statute can plausibly be read to support either side's view.
 2 Legislative Intent and Circumstances Surrounding Statute's Enactment
Both sides point to the legislative history in support of their arguments. Anderson v. Ludgin, 175 Conn. 545, 554, 400 A.2d 712 (1978). CT Page 17024
The defendant argues that the legislative history indicates that the legislature did not intend for the death penalty to apply to murders stemming from robberies. (Defendant's Revised Memorandum, pp. 29-32.) Specifically, the defendant notes that Senator Guidera remarked that "some of the cases which are not capital felonies. and therefore would not
receive the death penalty . . . [include] anyone who committed a murder during the commission of a felony; for example, the individual who goes into a gas station or liquor store, commits a burglary, and on his way out the door turns and shoots the owner or employee, he would not receive the death penalty." (Emphasis in original.) (Defendant's Revised Memorandum, pp. 29-30.) The defense also notes that Representative Pugliese offered and then withdrew in the face of opposition an amendment which would have included as capital felonies any murder committed during an armed robbery or burglary (Defendant's Revised Memorandum, p. 29.)
The State responds by asserting that Senator Guidera's remarks related to capital felonies, not aggravating factors, and therefore do not indicate a legislative hostility to applying the death penalty to particular types of crimes stemming from robberies, burglaries and larcenies. (State's Memorandum in Opposition, pp. 25-27; State's Supplemental Memorandum, pp. 4-5.) The State notes that Senator Guidera also stated that "[t]he only crimes which have been designated as capital felonies are those in which there is a high degree of deterrence — the lifer who attempts to escape from prison, the rooftop sniper who fires on [firemen] in the performance of their duties, the bank robber or the liquor store hold-up man who kills a policeman who attempts to foil his plans. . . ." (State's Memorandum in Opposition, p. 27.)
Having reviewed the relevant legislative history, this Court concludes that while the State probably has a slightly better argument on this issue, the legislative history can fairly be read as supporting both parties' arguments. The legislative history is, therefore, inconclusive and does not substantially advance either side's claims. In the absence of a more definitive indication of what was the legislature's purpose, even clear indications of the legislative intent of one or two legislators, or sponsors, is of only limited significance.
 3 Structure of Statute as a Whole
It is noteworthy that all of the aggravants listed in § 53a-46a (i) — and indeed, all of the capital felonies listed in § 53a-54b
— pertain to only one category or kind of prohibited conduct. Section 53a-46a (i)(1) applies to defendants committing the claimed capital aggravant during the commission or attempted commission or during CT Page 17025 the immediate flight from a felony after having been previously convicted of the "same felony." Section 53a-46a (i)(2) applies to defendants committing the capital offense after having been convicted of certain prior offenses. Section 53a-46a (i)(3) pertains to a defendant committing a capital offense and in such commission knowingly creates a grave risk of death to someone other than the victim. Section 53a-46a (i)(4) applies to a defendant committing the capital offense in an especially cruel, heinous or depraved manner. Sections 53a-46a (i)(5) and (6) relate to the pecuniary gain issue. Section 53a-46a (i)(7) pertains to a defendant committing the capital offense with an assault weapon.
The State's argument, however, is that § 53a-46a (i)(6) should be read to apply to two distinct broad categories of prohibited conduct: first, murders for hire or contract killings; and second, to robberies, larcenies and/or burglaries resulting in the defendant receiving something of pecuniary value. It is not logical to assume that the legislature would set out only one kind of prohibited conduct in each of the other aggravants but this one. Nor is it logical to assume that the legislature intended to lump two distinctive kinds of prohibited conduct — contract killings, and the felonious taking of property — into one aggravant. It is more logical to assume that, if the legislature had wanted to turn killings accomplished during robberies, burglaries and larcenies into an aggravant, it simply would have said so in a separate, unambiguous and straightforward aggravant.
 4 Surplusage Argument
The State argues that the phrase "or in expectation of the receipt of anything of pecuniary value" would be mere surplusage if the statute is not read to encompass factual scenarios involving robberies followed by a killing. Because statutes must be read to avoid "mere surplusage," the State argues, see, e.g., State v. Gibbs, 254 Conn. 578, 758 A.2d 327
(2000) and United States v. Walker, supra, 910 F. Sup. 837, these words should be read to include fact patterns such as those in the instant case. This Court does not agree.
Whether or not the disputed language is "mere surplusage" depends on how one chooses to read it. This language is not "mere surplusage" if § 53a-46a (i)(6) is read as a parallel section to (i)(5) — to encompass situations in which a procurer promises payment of anything of pecuniary value in the future to a person who commits a crime in expectation of receiving, in the future, anything of pecuniary value. This language can be read as nonsurplusage if it is read to cover X's promise to pay Y, at some later date, for the killing of Z. CT Page 17026
Moreover, even if the language were to be viewed as mere surplusage, resort to this canon of statutory construction in no way supplants the need to analyze the legislature's purpose in enacting the statute using the language it used. As has been long noted, canons of statutory construction can be selectively cited for opposing interpretations in a wide variety of instances. See, e.g., Llewellyn, "Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed," 3 Vand.L.Rev. 395, 401-08 (1950). Resort to a particular canon of construction does not replace the need for a searching inquiry as to the meaning of particular statutory language.
 5 Meaning of the Word "Receipt"
At the heart of the State's argument is the contention that the word "receipt" as used in the statute should be read to cover a situation in which a defendant obtains something of, pecuniary value from a victim by stealing it or taking it. This Court does not agree that the word "receipt" as used in the statute should be so construed, and finds that the state's reading is unduly broad, ignores the context in which the word "receipt" is used, and strains its meaning in an attempt to extend the statute to situations not within the contemplation of the legislature.
The word "receive," as a verb, can mean many things. Like many words, it has a variety of meanings and shades of meanings. Williams ElectricCooperative, Inc. v. Montana-Dakota Utilities Co., 79 N.W.2d 508 (N.D. 1956) (the word "receive" is a relative term and the meaning differs depending on how it is employed). It carries different implications when employed in criminal law, commercial law, and other areas of the law. The Oxford English Dictionary lists no fewer than 17 different listings for "receive." Both sides can point to cases in which the word "receive" is construed in support of their argument. As Justice Breyer stated in a dissenting opinion in Schenck v. Pro-Choice Network of Western New York,519 U.S. 357, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997), "[w]ords take on meaning from context." Id., 395.
The fact that each side can point to dictionary definitions supporting their position in no way resolves the question of how the word "receipt" should be understood in this case. As Justice Borden noted in Northropv. Allstate Ins. Co., 247 Conn. 242, 720 A.2d 879 (1998), "[a] dictionary does not define the words listed in it in the sense of stating what the words mean universally. Rather, it sets out the range of meanings that may apply to those words as they are used in the English language, CT Page 17027 depending on the varying contexts of those uses." Id., 250.
Nor is the definition given to the word "receive" or "receipt" in other legal contexts determinative of how it should be understood in this case. See, e.g., U.S. v. Fikes, 373 F. Sup. 1052 (E.D.Mich. 1974), aff'd., 510 F.2d 973 (1975) (the broad definition of "receive" is construed to mean to take a weapon into possession and control, as used in the federal prohibition of convicted felons receiving any firearm in or affecting interstate commerce). In seeking to understand the meaning of "receipt" as used in this section, the Court should examine the "common understanding" of the term. State v. Spillane, 255 Conn. 746,755, 770 A.2d 898, reconsideration granted, 257 Conn. 750, 778 A.2d 101
(2001).
 * * * * * * * * *
In common parlance, one does not refer to a robber or burglar "receiving" the things he steals. In everyday usage, persons committing larcenies are not said to "receive" the things they steal; they are said to "steal" them, "take" them, or possibly "obtain" them or "come into possession" of them through illegal means. No person speaking or writing in everyday English would say that a robber had "received" a thousand dollars he had stolen from a bank; or that a burglar had "received" a diamond necklace he stole from a house. Typically, people "receive" things from other people who have voluntarily given something to them. Typically, to "receive" something suggests that another person has given it or provided it willingly, not through compulsion or coercion. The interpretation of receiving urged by the State, when measured against the normal usage of "receipt" or "receive," is contorted.
This Court concludes that decisions such as Walker which have concluded that the word "receipt" applies to robberies, burglaries and larcenies have failed to examine the word "receipt" in context. if one removes the word "receipt" from the context of the statute, its meaning can reasonably be extended to apply to the instant situation. But a contextual reading of the word "receipt," in the Court's view, does not support the State's argument.
The court's analysis in Walker, referenced above, or other similar cases, provides a good example of this noncontextual approach. This Court concludes that in Walker as in cases supporting the State's position, the word "receipt" has been torn from its contextual moorings to reach an overly broad interpretation.
 * * * * * * * * * CT Page 17028
A dispassionate view of the plain language of the applicable statutory language viewed in context, the structure of the statute, and the relevant rules of construction in criminal cases, viewed in the light of the narrowing impulse in our State's death penalty jurisprudence, combine to convince this Court that the State's expansive interpretation of this claimed aggravant's applicability to this case, while plausible, is unpersuasive. The issue, to repeat, is not whether the language of the statute could be construed to apply to the present case, but whether the legislature intended that it would. This Court concludes that the State's interpretation of the "pecuniary gain" aggravant is at best in rough equipoise with the defendant's interpretation. To apply § 53a-46a (i) (6) to the facts of this case would, in the "Court's view, run afoul of the legislature's purpose. As our Supreme Court stated in State v.Breton, supra, 212 Conn. 258, "[c]ourts must avoid imposing criminal liability where the legislature has not expressly so intended. . . . This construction is all the more compelling where, as here, the defendant's life is at stake." (Citation omitted.) Id., 268-69. A broad reading of this section would have another predictable consequence: it would permit the imposition of the death penalty to a wide variety of foreseeable circumstances stemming from robberies, armed robberies, and burglaries. If the legislature wishes such conduct to constitute an aggravant, significantly broadening the reach of our death penalty statutes, then it must explicitly say so.[9]
 C Summary and Conclusion — Pecuniary Gain Issue
For the reasons stated, the defendant's motion to dismiss this aggravant is granted in light of the Court's conclusion that the statutory language applies only to killings which are an essential prerequisite, see State v. Chew, supra, to obtaining anything of pecuniary value, including "murders for hire" or contract killings, killings to obtain insurance proceeds, murders for inheritance, or murders in certain business contexts (e.g., the murder of a partner) which will, due to the operation of law, create pecuniary gain for the perpetrator. Accordingly, the defendant's motion to dismiss the "pecuniary gain" aggravant is granted.
 VI CLAIMED STATUTORY BAR: AGE OF TEE DEFENDANT AT THE TIME THE PREDICATE OFFENSE WAS COMMITTED
The third issue relates to whether there is a statutory bar to imposition of the death penalty under § 53a-46a (h)(1), or a CT Page 17029 constitutional bar or prohibition, when the predicate "same felony" offense under § 53a-46a (i)(1) was committed by a defendant when he or she was under the age of eighteen years.[10] This argument is set out by the defendant in his October 5, 2001, Motion to Dismiss Aggravating Factor.
On May 20, 1993, the defendant pleaded guilty to the charge of larceny in the third degree in connection with the theft of a car. At the time of the plea, he had recently turned eighteen. He was sixteen years old at the time of the alleged conduct.
Defendant argues that the "same felony" aggravant is void for vagueness because it fails to provide notice of the fact that conduct which occurred prior to his eighteenth birthday could be used by the State to support a penalty of death. Defendant contends that applying the "same felony" aggravating factor to a prior conviction resulting from a guilty plea violates the equal protection and due process clauses of the United States Constitution. Defendant also argues that the plea proceeding underlying the prior "same felony" was fatally flawed for other reasons.
As indicated above, issues which require factual findings are not properly addressed in this decision. Consequently, claims which might require an evidentiary hearing are left for another day or another forum.
The fact that the defendant was not advised that his plea of guilty could become a predicate offense in a death penalty case is not a flaw. There is no requirement that a defendant be informed of every possible consequence of a guilty plea, no matter how hypothetical or remote it may be. State v. Gilnite, 202 Conn. 369, 383, 521 A.2d 547 (1987). Defendants are entitled to be informed of definite, immediate and largely automatic consequences of guilty pleas, not of distant, speculative and potential ones. Sherbo v. Manson, 21 Conn. App. 172, 572 A.2d 378, cert. denied,215 Conn. 809, 576 A.2d 539 (1990).
Defendant's claim that his plea was induced by a "promise" that he would receive an alternative incarceration program has no legal support and is unpersuasive. Moreover, the judge who accepted that plea said only that he would "try" to put the defendant in "some alternative to jail."
The "void for vagueness" claim likewise fails. The void for vagueness doctrine "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357,103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). But a validly enacted statute carries CT Page 17030 "a strong presumption of constitutionality," and those who challenge it must sustain "the heavy burden of proving its unconstitutionality beyond a reasonable doubt." (Internal quotation marks omitted.) Fleming v.Garnett, 231 Conn. 77, 88, 646 A.2d 1308 (1994). The defendant has failed to meet this heavy burden. Additionally, while defendants are entitled to be informed of the "substantive elements of the crime charged" with reasonable clarity, State v. Cobb, 251 Conn. 285, 438-39, 743 A.2d 1
(1999), cert. denied, 531 U.S. 841, 121 S.Ct. 106, 148 L.Ed.2d 64
(2000), "the due process vagueness principle simply does not apply to the sentencing factor . . . because that factor does not implicate the determination of whether the defendant's contemplated conduct constituted a crime." Id., 440. Defendant's vagueness claim is rejected.
Defendant's equal protection and due process arguments are premised on the fact that § 53a-46a (h) prohibits the Court from imposing the death penalty if the defendant "at the time of the offense (1) . . . was under the age of eighteen years. . . . In this case, the State is relying on a previous "same felony" offense which the defendant committed when he was sixteen years old, and to which he pleaded guilty when he was eighteen years old. Because the State is barred from imposing the death penalty on someone for an offense committed before they were eighteen years old, the defense argues, the State may not rely upon a predicate prior felony committed when the defendant was not yet eighteen.
This argument is not persuasive. The plain language of relevant statutory provisions fails to support defendant's contention and makes it clear that the crime to which the death penalty can apply is the capital felony, e.g., the crime resulting in the death of the victim. There is nothing in the legislative history that vitiates the clear thrust of this language. Additionally, as the State notes, it has been held that repeat offender laws penalize only "the last offense committed by the defendant." Oyler v. Boles, 368 U.S. 448, 451, 82 S.Ct. 501,7 L.Ed.2d 446 (1962).
If the legislature concludes that it is unjust or inhumane to apply the death penalty statute to cases in which a predicate same felony offense was committed by a defendant prior to his or her eighteenth birthday, it is free to take ameliorative steps. In the final analysis, this issue raises significant policy concerns which are properly addressed by the legislature, not this Court.
 VII SUMMARY AND CONCLUSION
For the reasons stated above, the defendant's motion to dismiss CT Page 17031 aggravating factors is granted as to the "pecuniary gain" factor and denied in all other respects.
Douglas S. Lavine Judge, Superior Court